**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 1, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

AUSTIN P. BOND, as Special
Administrator of the ESTATE OF
DOMINIC F. ROLLICE, deceased,

      Plaintiff - Appellant,

v.

CITY OF TAHLEQUAH, Oklahoma;
BRANDON VICK; JOSH GIRDNER,

      Defendants - Appellees.

No. 19-7056

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:18-CV-00257-RAW)**
_____

Robert M. Blakemore (Daniel Smolen and Bryon D. Helm with him on the brief),
Smolen & Roytman, Tulsa, Oklahoma, for Plaintiff - Appellant.

Scott B. Wood, Wood, Puhl & Wood, PLLC, Tulsa, Oklahoma, for Defendants -
Appellees.
_____

Before **MATHESON**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

On August 12, 2016, Officers Brandon Vick and Josh Girdner shot and killed Dominic Rollice. The administrator of Dominic's[1] estate brought a § 1983 claim against Officers Vick and Girdner alleging they used excessive force against Dominic in violation of his Fourth Amendment rights.[2] The district court granted summary judgment to Officers Vick and Girdner on the basis of qualified immunity. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse because a reasonable jury could find facts under which Officers Vick and Girdner would not be entitled to qualified immunity.

## I.    BACKGROUND

### A.  *Factual History*[3]

On August 12, 2016, Dominic's ex-wife, Joy, called 911. She requested police assistance: "Hey, can I get somebody to come over to my house, my ex-husband is in the garage, he will not leave, he's drunk and it's going to get ugly real quick." Ex. 1

---

[1] For clarity, we refer to Dominic Rollice and his ex-wife, Joy Rollice, by their first names.

[2] Robbie Burke, the administrator of Dominic's estate when the suit commenced, passed away during the pendency of this case. On September 25, 2020, we granted Austin Bond's motion to be substituted for Ms. Burke.

[3] This factual recitation focuses on the information the officers had at the time of the encounter. Information not available to the officers, such as what happened earlier that day or who legally owned the residence, is immaterial because the reasonableness of the officers' actions is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

at 00:01–00:13.[4] The dispatcher responded, "If we send somebody out there, he will go to jail for being intoxicated in public, if that's what you want to happen." Ex. 1 at 00:22–00:28. Joy replied, "Yes, that is." Ex. 1 at 00:29–00:30. The dispatcher then asked whether Dominic lived at the residence, to which Joy responded, "No, he doesn't live here. He's a registered sex offender and lives in Park Hill. He's my ex-husband. He's still got tools in the garage. He doesn't live here." Ex. 1 at 00:30–00:45.

Officer Josh Girdner responded to Joy's 911 call, and Officer Chase Reed responded as Officer Girdner's backing officer. Officer Brandon Vick, the patrol shift supervisor, also responded to the call. It is disputed exactly how much information the officers received from the dispatcher, but it is undisputed they knew Dominic was Joy's ex-husband, he was intoxicated, and Joy wanted him gone. *See, e.g.*, App., Vol. II at 320 (Officer Girdner knew "that [Joy's] ex-husband was at her house and he was intoxicated and she feared . . . [what might] happen").

Officer Girdner and Officer Reed arrived at about the same time and met Joy in the front yard. Officer Girdner spoke with Joy, who told him why she called 911.[5]

---

[4] We refer to the conventionally filed exhibits in this case by the exhibit numbers used in the summary judgment filings before the district court. App., Vol. II at 309, 376. Exhibit 1 is a recording of Joy's 911 call, and Exhibit 7 is Officer Reed's bodycam footage.

[5] There is no dispute this conversation occurred. Aplt. Br. at 4 (citing App., Vol. II at 344–45). But it is disputed how much Joy told Officer Girdner, specifically whether Joy explained Dominic did not live there. *See* Aplt. Br. at 4 ("Officers Reed, Girdner, and Vick did not know that [Dominic] no longer lived at the residence.").

3

Joy then showed Officers Girdner and Reed to the side entrance of the garage, where they met Dominic. Officer Vick arrived while Officers Girdner and Reed were talking to Dominic at the side door to the garage.

Officer Girdner believes he explained to Dominic why they were there. Dominic expressed concern that the officers intended to take him to jail, and Officer Girdner told him they were not going to do that. Instead, they were "going to try to get him a ride out of there." App., Vol. II at 325; *see also* App., Vol. II at 203, 351. Dominic informed the officers that he had a ride coming. During the conversation, Officer Girdner perceived Dominic as "fidgety." App., Vol. I at 198; *see also* App., Vol. II at 325 ("He kept fidgeting with his hands."); Ex. 7 at 00:00–00:13. Based on that perception, Officer Girdner asked to pat down Dominic.[6] Dominic refused.

Officer Reed's body camera began capturing video at some point during this exchange.[7] It is difficult to tell if the video starts before, during, or after Officer Girdner's request to pat down Dominic because there is no audio for the first thirty seconds of video.

---

[6] There is some dispute as to whether Dominic was wearing clothing in which he could easily conceal a weapon. *See* Aplt. Br. at 5–6 (citing App., Vol. II at 326).

[7] The parties do not dispute that the video is an accurate depiction of the subsequent events. Rather, they dispute what the video shows. Because this is an appeal from a grant of summary judgment, we describe the facts viewing the video in the light most favorable to the Estate, as the nonmoving party. *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020).

The video appears to show Dominic talking to Officer Girdner and gesturing with his hands. Dominic also appears to be fidgeting with something in his hands.[8] Officer Girdner then begins gesturing with his hands and takes a step toward the doorway, causing Dominic to take a step back.[9] Officer Girdner continues gesturing and walking toward Dominic, through the doorway and into the garage. Dominic turns and walks to the back of the garage, as Officer Girdner continues to point at and follow him. Officers Reed and Vick then follow Dominic and Officer Girdner into the garage. The officers claim that before the sound starts on the video, Officer Girdner ordered Dominic to stop.[10]

When Dominic reaches the back of the garage, he turns around briefly to face the officers. Then he turns to the work bench on the back wall of the garage and grabs a hammer hanging above it. As Dominic faces the officers with the hammer, the officers back up and draw their guns. Dominic initially grasps the hammer with

---

[8] Neither party has identified this object.

[9] The district court and the officers view the video as showing that Dominic backed away and the officers followed him into the garage. But the video shows Officer Girdner took the first step toward Dominic, and Dominic took a step back only after Officer Girdner moved toward him. At the very least, a jury could so view it, and the facts must be taken in the light most favorable to the Estate in this procedural posture.

[10] The officers also claim that before the sound starts, Dominic said, "One of us is going to fucking die tonight." The Estate disputes this claim, and the district court did not consider it as part of its analysis. App., Vol. III at 600 n.4. Because we must view the facts in the light most favorable to the Estate, we also do not consider the alleged statement.

both hands, as if preparing to swing a baseball bat. But then he drops his left hand down, holding it out in front of him as if to signal the officers to stop or to create distance between himself and them. Dominic holds the hammer in his right hand just above his head.

At this point, Officer Reed is standing in the middle of the three officers with Officer Girdner to Officer Reed's left, and Officer Vick to Officer Reed's right. The audio starts about this time and records the officers yelling at Dominic to drop the hammer. The officers repeatedly shout at Dominic, telling him to drop it, and he repeatedly refuses, saying "No." Ex. 7 at 00:30–00:40. During this exchange Dominic slowly moves to the officers' left, coming from behind furniture, so that the officers are the only obstruction between Dominic and the exit. Officer Girdner estimated there were about eight to ten feet between himself and Dominic.

At this point, Officer Reed states he has decided to "go less lethal," and he holsters his gun and pulls out his taser. The officers continue to order Dominic to drop the hammer, and Dominic responds, "I have done nothing wrong here, man. I'm in my house. I'm doing nothing wrong." Ex. 7 at 00:45–00:49.[11] Officer Reed then takes a few steps toward Dominic, and Dominic says, "I see your taser." Ex. 7 at 00:50–00:52. An officer then yells, "Drop it now," and Dominic again says, "No."

---

[11] Despite this statement, the wording in the district court's order, and the Estate's briefing that Dominic was killed in "his own garage," Aplt. Br. at 13, 20, the property was legally owned by Joy at the time of this incident. Dominic may have had permission to be on the property earlier that day or at other times to access the tools he kept in the garage.

Ex. 7 at 00:50–00:52. During this exchange, Dominic appears to pull the hammer back behind his head. But he is still talking to the officers, relatively calmly, with one hand outstretched. In response to Dominic's movement with the hammer, Officers Girdner and Vick fire multiple shots. Dominic doubles over into a squatting position as the bullets hit him. Still holding the hammer, he groans and raises the hammer. Officer Girdner fires again. The officers yell one last time for Dominic to drop the hammer, and he does. Next, the officers order Dominic to get on the ground and he rocks back, falling to the ground. Emergency Medical Services later transported Dominic to a hospital where he was pronounced dead.

### B. *Procedural History*

The Estate filed the operative Second Amended Complaint on October 23, 2018, in which it asserted a § 1983 claim against Officers Vick and Girdner as well as a *Monell* claim against the City of Tahlequah (the "City"). The officers and the City filed separate motions for summary judgment. The district court entered two orders on September 25, 2019: one granted summary judgment to the officers on the basis of qualified immunity and one granted summary judgment to the City. The Estate filed a timely appeal on October 25, 2019. The appeal challenges only the district court's grant of summary judgment to the officers.

## II.   DISCUSSION

### A. *Standard of Review*

"We review grants of summary judgment based on qualified immunity de novo." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotation marks

7

omitted). We will affirm when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (quotation marks omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (quotation marks omitted). "When the record on appeal contains video evidence of the incident in question . . . we will accept the version of the facts portrayed in the video . . . only to the extent that it 'blatantly contradict[s]' the plaintiff's version of events." *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### *B. Legal Background*

#### 1. Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 557 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A defendant's assertion of qualified immunity from suit under 42 U.S.C. § 1983 results in a presumption of immunity. *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). A plaintiff "can overcome this presumption

8

only by showing that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (citation and internal quotation marks omitted). The plaintiff must satisfy both prongs to overcome a qualified immunity defense, and we may exercise our discretion as to which prong to address first. *See Pearson,* 555 U.S. at 236.

## 2.     Excessive Force Under the Fourth Amendment

"Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment, depending on where the plaintiff finds himself in the criminal justice system at the time of the challenged use of force." *McCowan v. Morales*, 945 F.3d 1276, 1282–83 (10th Cir. 2019) (internal quotation marks omitted). Where, as here, the alleged excessive force occurred prior to arrest, it is the Fourth Amendment that applies. *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014).

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable." *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (internal quotation marks omitted). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v.*

9

*Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This is a "totality of the circumstances" analysis. *Garner*, 471 U.S. at 8–9. When considering "the facts and circumstances of each particular case," we specifically consider three factors outlined by the Supreme Court in *Graham*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. We need touch only briefly on the first and third factors, which the district court found favored the Estate, because the parties largely agree the district court evaluated them correctly.[12]

---

[12] The officers argue with regard to the first factor that "[a]lthough the initial encounter only involved a misdemeanor trespass the actions of [Dominic] during the encounter raised concern . . . including [Dominic's] 'fidgety' stance and refusal to be patted down for weapons . . . [and] intentional retreat into the garage." Aple. Br. at 15 (quoting App., Vol. I at 198). But the officers do not claim they suspected Dominic of a more severe crime. And the officers do not address the third factor at all. The Estate, for its part, does not disagree with the district court's analysis of the first and third factors, but asserts these factors were improperly underweighted.

Our precedents instruct that the *Graham* factors are applied to conduct which is "immediately connected" to the use of deadly force. *Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake*, 60 F.3d 702, 705 n.5 (10th Cir. 1995) (quotation marks omitted). Officers' conduct prior to the seizure is also relevant to this inquiry: "The reasonableness of [officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted). We have held that even when an officer uses deadly force in response to a clear threat of such force being employed against him, the *Graham* inquiry does not end there. *Allen v. Muskogee*, 119 F.3d 837, 839, 841 (10th Cir. 1997) (holding a rational jury could conclude officers' reckless conduct created lethal situation and that would constitute a violation of a decedent's Fourth Amendment rights). Instead, we consider whether the *Graham* factors were met under the totality of the circumstances, including whether the officers approached the situation in a manner they knew or should have known would result in escalation of the danger. *See id.* at 841.

For example, in *Allen*, the decedent, Terry Allen, "left his home after an altercation with his wife and children." 119 F.3d at 839. The altercation was reported to police, along with information that Mr. Allen had several guns and ammunition with him and had threatened family members. *Id.* Shortly thereafter, Mr. Allen's sister reported that Mr. Allen was parked in front of her house and was threatening

11

suicide. *Id.* When police arrived, Mr. Allen was "sitting in the driver's seat with one foot out of the vehicle. He had a gun in his right hand, which was resting on the console between the seats." *Id.* After removing the bystanders, a Lieutenant Smith repeatedly told Mr. Allen to drop the gun, but he refused. *Id.* Two additional officers arrived on the scene, and the situation soon escalated:

> Lt. Smith then reached into the vehicle and attempted to seize Mr. Allen's gun, while Officer [McDonald] held Mr. Allen's left arm. Officer Bryan Farmer, who arrived with Officer [McDonald], approached Mr. Allen's car from the passenger side, and attempted to open a passenger side door. Mr. Allen reacted by pointing the gun toward Officer Farmer, who ducked and moved behind the car. Mr. Allen then swung the gun toward Lt. Smith and Officer McDonald, and shots were exchanged. Lt. Smith and Officer McDonald fired a total of twelve rounds into the vehicle, striking Mr. Allen four times. The entire sequence, from the time Lt. Smith arrived to the time Mr. Allen was killed, lasted approximately ninety seconds.

*Id.* Mr. Allen's estate sued, asserting that the officers used excessive force. After the district court granted the individual officers summary judgment on the ground their actions did not violate the Fourth Amendment, we reversed, holding that "the officers' preceding actions were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the reasonableness inquiry," and that "a reasonable jury could conclude . . . that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841 (quoting *Romero*, 60 F.3d at 705 n.5).

We reached a similar conclusion in *Estate of Ceballos*. There, Quianna Vigil called police to report her husband Jamie Ceballos "was in their driveway with a baseball bat 'acting crazy,' and that he was drunk and probably on drugs." *Estate of*

12

*Ceballos*, 919 F.3d at 1208–09. Ms. Vigil indicated she had left the home but wanted Mr. Ceballos removed so she could return to put her seventeen-month-old child to bed. *Id.* at 1209. Defendant William Husk and several other police officers responded, finding Mr. Ceballos alone in the driveway. *Id.* at 1209–10. They repeatedly ordered Mr. Ceballos to drop his bat, but instead he went into his garage. *Id.* at 1210. Officer Husk drew his firearm and another officer drew a taser. *Id.* Mr. Ceballos then came out of the garage and began advancing toward the officers, who did not retreat. *Id.* at 1210–11. Instead, they repeatedly ordered him to drop the bat. *Id.* at 1210. When Mr. Ceballos did not comply, Officer Husk fired, killing him. *Id.* at 1211.

Mr. Ceballos's family sued, claiming the officers acted recklessly, thereby creating the need for deadly force. We agreed, and further concluded that our earlier "decision in *Allen* would have put a reasonable officer on notice that the reckless manner in which Husk approached Ceballos and his precipitous resort to lethal force violated clearly established Fourth Amendment law." *Id.* at 1220.

We also applied *Allen* in *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished).[13] There, Todd Hastings telephoned Family and Children

---

[13] Although this decision is unpublished, we relate the facts in some detail to explain why we find it persuasive. *See Noreja v. Comm'r, SSA*, 952 F.3d 1172, 1176 (10th Cir. 2020) ("[I]n appropriate circumstances [we look] to an unpublished opinion if its rationale is persuasive and apposite to the issue presented."); 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").

Services, expressing thoughts of suicide and a plan to asphyxiate himself. *Id.* at 198. Four police officers responded to perform a well-being check, after being informed that Mr. Hastings was suicidal, non-violent, and not known to be armed. *Id.* at 198-99. The officers arrived at Mr. Hastings's residence, engaged him in conversation, and confirmed he had threatened to harm himself. *Id.* at 199. When an officer asked Mr. Hastings to step onto the front porch and talk, Mr. Hastings seemed nervous and said he wanted to get his shoes. *Id.* Before Mr. Hastings could shut the door, one officer blocked it with his foot and all four officers entered the house and cornered Mr. Hastings in his bedroom. *Id.* As the officers opened the bedroom door, Mr. Hastings picked up a Samurai sword, initially holding it "in a defensive manner, not aggressively." *Id.* at 199–200. The officers repeatedly told Mr. Hastings to put the sword down, but he did not comply *Id.* at 200. When one of the officers employed pepper-spray, Mr. Hastings "turned the sword toward the officers and began moving toward them." *Id.* The officers "attempted to retreat[,] but it was too crowded in the bedroom's doorway." *Id.* Two of the officers fired at Mr. Hastings, killing him. *Id.*

Mr. Hastings's brother sued the officers who fired shots. *Id.* at 198. The officers moved for summary judgment on the issue of qualified immunity, but the district court denied their motion. *Id.* On appeal, this court affirmed.

We acknowledged that, "[a]t the moment of the shooting, [Mr. Hastings] was advancing toward [the officers] with the sword." *Id.* at 203. Thus, "viewed in isolation, the shooting was objectively reasonable under the Fourth Amendment." *Id.* Nevertheless, we looked to *Allen* and *Sevier*, along with *Medina v. Cram*, 252 F.3d

14

1124, 1132 (10th Cir. 2001), and *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004), for the general principle that officers' reckless and deliberate conduct in creating a situation requiring deadly force may result in a Fourth Amendment violation. *Id.*

> Applying that principle, we held that
>
> viewing the facts in the light most favorable to [the plaintiff], a constitutional violation occurred. [Mr. Hastings] was not a criminal suspect. He was a potentially mentally ill/emotionally disturbed individual who was contemplating suicide and had called for help. Rather than attempt to help [Mr. Hastings, the officers] crowded themselves in [his] doorway (leaving no room for retreat), issued loud and forceful commands at him and pepper-sprayed him, causing him to become even more distressed. At the time they pepper-sprayed him, [Mr. Hastings] was not verbally or physically threatening them. At least one of the officers heard [Mr. Hastings] say "'help me'" or "'they are coming to get me.'" (R. App. at 210.) Although [Mr. Hastings] had a sword, his stance, at least up until the time he was pepper-sprayed, was defensive not aggressive, posing no threat to anyone but himself. A reasonable jury could find that under these facts [the officers'] actions unreasonably escalated the situation to the point deadly force was required.

*Id.* (footnote omitted). Moreover, we held the officers were put on notice this would be a violation by *Allen* and *Sevier*, which "clearly establish[ed] that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner" *Id.* at 206.

*Allen, Ceballos,* and *Hastings* teach that the totality of the facts to be considered in determining whether the level of force was reasonable includes any immediately connected actions by the officers that escalated a non-lethal situation to a lethal one. Accordingly, the totality of the circumstances includes application of the

15

*Graham* and *Estate of Larsen* factors to the full encounter, from its inception through the moment the officers employed force.

## *C. Analysis*

The Estate makes three arguments why the officers are liable: (1) the use of deadly force was not justified when the officers opened fire because Dominic's movements were defensive; (2) Officer Girdner's final shot was unjustified because even if Dominic originally presented a threat, he was no longer a threat when Officer Girdner fired the final shot; and (3) even if the use of deadly force was justified at the instance of shooting, the officers are nonetheless liable because they recklessly and deliberately created the circumstances necessitating deadly force. The officers argue that Dominic posed a serious threat to their safety through his aggressive actions, justifying the use of deadly force, and that Dominic's arming himself with the hammer was not the result of their actions. The parties also dispute whether, if the officers' conduct violated Dominic's rights, decisions from the Supreme Court or this court clearly established such conduct was unlawful.

The district court agreed with the officers, but it did so based on findings from the video evidence that demonstrate a failure to view that evidence in the light most favorable to the Estate. First, the district court found Dominic precipitated the retreat into the garage. As indicated, we conclude that a reasonable jury could view the video as showing that Officer Girdner took the first step forward, and Dominic responded by moving deeper into the garage. The district court also described Dominic's conduct in the garage, right before shots were fired, as "rais[ing] the

16

hammer still higher as if he might be preparing to throw it, or alternatively, charge the officers." App., Vol. III at 600. Although this is one fair interpretation of the video, we are not convinced it is the only way it can be viewed. A reasonable jury could find that Dominic was assuming a defensive, rather than an aggressive, stance.

Viewing the facts in the light most favorable to the nonmoving party—that Dominic acted defensively—does not, by itself, warrant reversal if the facts, properly construed, still support qualified immunity. We undertake that analysis now, ultimately concluding that, if the facts are found by the jury in the light most favorable to the Estate, the officers are not entitled to qualified immunity. We therefore reverse the decision of the district court.

1.     **Constitutional Violation**

To determine whether a reasonable jury could find that the officers violated Dominic's constitutional right to be free from excessive force, we apply the *Graham* factors to the facts in the light most favorable to the Estate. For purposes of discussion, we consider the first and third factors before turning to the crucial second factor.

17

*a. The Graham factors*

i.  <u>Severity of the crime</u>

Based on the 911 call, the officers may have had probable cause to believe the initial encounter involved misdemeanor trespass.[14] It is undisputed that the officers knew Dominic was Joy's ex-husband, he was intoxicated, and Joy wanted him removed from the property. There is no indication from the body camera video that Dominic was violent or otherwise belligerent at the beginning of his encounter with the officers. Accordingly, the severity of this nonviolent misdemeanor is low. When the severity of the crime is low, such as when the alleged crime was a misdemeanor or unaccompanied by violence, this factor weighs against an officer's use of force. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (concluding the severity of the crime was low when the suspect engaged in disorderly conduct, a petty misdemeanor under New Mexico law, "and the amount of force used should have been reduced accordingly").

ii.  <u>Active resistance or evasion of arrest</u>

It is undisputed that the officers did not intend to arrest Dominic when they first encountered him in the garage doorway. If the officers had no intent to arrest Dominic, he could not have been actively resisting arrest or attempting to evade

---

[14] Although the dispatcher on the 911 call told Joy that Dominic would be arrested for public intoxication, neither the district court nor the parties identify this as the crime at issue.

arrest by flight when he backed into the garage in response to Officer Girdner's approach.

The first and third *Graham* factors therefore weigh against finding the officers' use of force reasonable.

### iii. Immediacy of threat

"The second *Graham* factor . . . is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1215–16 (10th Cir. 2017) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). This is particularly true in deadly force cases, because "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009).

In evaluating the degree of threat we consider "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

The Estate makes three arguments as to why the second *Graham* factor should weigh in its favor. First, it contends Dominic did not pose a threat of serious physical harm because he was "'armed' only with a hammer . . ., did not charge or lunge at the

19

[o]fficers and did not swing or slash the hammer toward the [o]fficers." Aplt. Br. at 16. According to the Estate, when Dominic moved the hammer back behind his head, he did so "in a defensive stance." Aplt. Br. at 17. Second, the Estate contends, "there was clearly no reasonable basis for [Officer] Girdner to fire another shot into [Dominic] after he was already, and obviously, critically wounded, crouched over and helpless." Aplt. Br. at 20. Third, the Estate argues "any *arguable* threat posed by [Dominic] was directly attributable to the officers' own reckless or deliberate conduct during the seizure." Aplt. Br. at 18.

The officers disagree and argue that, by refusing to put the hammer down, Dominic indisputably posed a threat to them. They suggest Dominic was "rais[ing] the hammer higher" and taking "a stance which looked like he was going to charge at the officers or throw the hammer at them," and they thus reasonably believed he posed an immediate threat of serious bodily injury. Aple. Br. at 16–17. With respect to the final shot, Officer Girdner contends he fired in response to Dominic "yell[ing] out and rais[ing] the hammer again." Aple. Br. at 17. Thus, the officers contend, the use of deadly force was reasonable.

There is no dispute Dominic repeatedly refused to obey the officers' commands to drop his weapon. It is also undisputed that Officer Girdner was within eight to ten feet of Dominic. And Officer Reed, having moved in with his taser, was even closer.

Whether Dominic made any hostile movements toward the officers is less clear. Viewing the evidence in the light most favorable to the Estate, Dominic moves

20

the hammer behind his head in a defensive stance, and Dominic does not charge or lunge at the officers.

Dominic's manifest intentions are also susceptible to conflicting interpretations. Although Dominic does raise the hammer above his head, the video shows no winding up movements made by Dominic in preparation of throwing it at the officers. Moreover, immediately before raising the hammer in response to Officer Reed's approach, Dominic says, in a relatively calm manner, "I have done nothing wrong here, man. I'm in my house. I'm doing nothing wrong." Ex. 7 at 00:45–00:49. Thus, while the district court's interpretation of the video evidence is plausible, a reasonable jury could conclude Dominic did not make any movements to put the officers in fear of serious physical harm. This does not end the inquiry, however, because "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Accordingly, we must analyze whether the officers may have reasonably misperceived this conduct, which we do in part II.C.1.a.v, *infra.* Before undertaking that analysis, however, we first apply the *Graham* factors to the final shot, which is separately challenged by the Estate.

iv. <u>The final shot</u>

The Estate argues that even if the initial shots could be justified, the final shot—fired while Dominic was wounded and on the ground—cannot be. In *Estate of Smart*, we considered a similar claim. There, we explained that where an officer has an "opportunity to perceive that any threat had passed by the time he fired his final

21

shots," he violates the Fourth Amendment by shooting anyway. 951 F.3d at 1175–76. The Estate argues that occurred here. The officers disagree, painting the garage encounter as a rapidly developing, highly charged incident that required them to make split-second decisions. Aple. Br. at 19–20 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.")). *See also Cordova*, 569 F.3d at 1188 ("Reasonableness 'must be judged from the perspective of a reasonable officer on the scene,' who is 'often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting *Graham*, 490 U.S. at 396–97).

It is true that the speed of the encounter makes it difficult to separate the analysis of the first shots and the final one. The first and third factors from *Graham*—the severity of the crime and whether Dominic was evading arrest—are not altered by the intervening shots. Applying the *Estate of Larsen* factors to assess the immediacy of the threat under the second *Graham* factor, Dominic's failure to comply with police commands continued after the first shots and the distance between the officers and Dominic did not materially change, although the officers appear to take a step back. With respect to hostile movements and manifest intent, there are at most two seconds between the initial shots and the last one, during which Dominic does appear to lift the hammer. But he is in a crouched position and angled

22

away from the officers when he does so, and it is unclear whether the cry he utters is due to pain or aggression.

Thus, as with the initial volley, the circumstances surrounding the final shot are subject to different interpretations. And those facts are part of the totality of the circumstances that we must consider in determining whether the officers are entitled to qualified immunity.

v.  Reasonable mistake

Even if the officers misperceived Dominic's defensive movements as aggressive, they are entitled to qualified immunity if the misperception was reasonable. *Estate of Turnbow v. Ogden City*, 386 F. App'x 749, 753 (10th Cir. 2010) (unpublished) ("The officers are not required to be correct in their assessment of the danger presented by the situation, only that their assessment be objectively reasonable."). This applies both to the officers' possible misperception that Dominic's defensive movements were aggressive prior to firing and to Officer Girdner's possible misperception that Dominic remained a threat after the first volley of shots.

That Dominic had only a hammer rather than a gun or other long-range weapon, was engaging verbally with the officers, and never dropped his left arm from what can be interpreted as a defensive position, could allow a jury to find that the officers unreasonably misperceived his raising the hammer as an aggressive movement. And that Dominic was on his knees angled away from the officers when he again raised the hammer could allow a jury to conclude Officer Girdner's final

23

shot was also based on an unreasonable misperception of Dominic as a continuing threat. To be sure, a reasonable jury could also find the officers acted reasonably under the circumstances they perceived, even if they were mistaken.

Taken together, the *Graham* factors as applied to the few seconds in which Dominic was wielding a hammer would present a close call on whether summary judgment was proper. But we need not and do not reach any conclusion on that issue because our review is not limited to that narrow timeframe. Instead, we consider the totality of circumstances leading to the fatal shooting, including the actions that resulted in Dominic being cornered in the back of the garage by three armed police officers. *See Sevier*, 60 F.3d at 699 ("The reasonableness of [officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." (footnote omitted)).

### b. *Conduct of police officers*

The district court found "no issue for a reasonable jury" as to whether the officers' conduct toward Dominic unreasonably created the need for the use of deadly force. App., Vol. III at 603. The district court likely arrived at this conclusion based on its view that Dominic "backed up and then turned and walked away from [Officer] Girdner to the back of the garage." App., Vol. III at 599. But, as explained, the video seems to depict Officer Girdner taking the first step toward Dominic, causing Dominic to step back from the side door into the garage. Then, as Officer Girdner continues to move forward, Dominic retreats further into the garage, eventually

24

reaching the work bench and retrieving the hammer. When the encounter began, the officers had no basis for an involuntary frisk[15] and no intention of arresting Dominic.

When the video is viewed in the light most favorable to the Estate, Officer Girdner backs Dominic into the garage and the other officers follow. By the time Dominic turns around to face the officers, he is effectively cornered in the garage. The three officers, who claimed they had no intention of arresting him and wanted only to get him a ride out of there, are now blocking the only exit from the garage and the only path to the ride that Dominic claims is on the way. Dominic, who the officers knew to be intoxicated, then grabs a hammer and extends one arm toward the officers. When Dominic pulls the hammer back, he does so in response to Officer Reed's advance with the taser.[16] Thus, we must determine whether a jury could conclude Officer Girdner's initial advance toward Dominic and the officers'

---

[15] Officer Girdner stated he asked to pat Dominic down because he "acted nervous and fidgety when I encountered him," App., Vol. I at 198, and "was wearing clothes at the time where it would have been . . . easy to conceal a weapon," App., Vol. II at 326. But the "fidgeting," according to Officer Reed, was Dominic touching his own chest. App., Vol. II at 354–55. This movement was accompanied by Dominic stating "Look, I don't have anything" in response to Officer Girdner's request to pat him down. App., Vol. II at 354–55. A jury could therefore disbelieve Officer Girdner's testimony that Dominic was fidgeting prior to the request, believing instead Officer Reed's testimony that, not only was the fidgeting a response to the request, it was made as part of Dominic's overall communication that he was unarmed. Further, "nervousness alone cannot support reasonable suspicion." *United States v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002) (quotation marks omitted). In the absence of an argument to the contrary from the officers, we assume Officer Girdner lacked reasonable suspicion for an involuntary pat down.

[16] Because Officer Reed is not a defendant, the reasonableness of his actions, *i.e.*, his advancement toward Dominic with the taser, is not at issue in this case.

25

subsequent cornering of Dominic in the back of the garage recklessly created the situation that led to the fatal shooting.

The Estate claims the jury could reach that finding, pointing to our decisions in *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). We agree those decisions are instructive. As discussed above, in each of those decisions we held officers violated the Fourth Amendment where they recklessly confronted armed and impaired individuals, creating the need for the use of deadly force.

Here, after Dominic declined Officer Girdner's request to frisk him, Officer Girdner advanced toward Dominic, and Dominic retreated into the garage. All three officers followed, cornering Dominic in the garage where he armed himself with a hammer. The full encounter, from the request to frisk to Dominic's collapse on the floor, took less than a minute and is properly considered as part of the totality of the circumstances. *See Allen*, 119 F.3d at 841 ("The entire incident, from the time [the officer] arrived to the time of the shooting, took only ninety seconds. Clearly, the officers' preceding actions were so immediately connected to Mr. Allen's threat of force that they should be included in the reasonableness inquiry." (internal quotation marks omitted)).

As in *Allen* and *Estate of Ceballos*, the officers here advanced upon an impaired individual, likely escalating the tension and fear. *See Allen*, 119 F.3d at 841, 843 (describing the officers' approach and characterizing Mr. Allen as an "armed mentally ill or emotionally upset person[]"); *see also Estate of Ceballos*, 919 F.3d

26

at 1217 ("[T]he responding officers knew Ceballos's capacity to reason was diminished, whatever the underlying reason might have been—mental health problems, emotional distress, drunkenness, or drugs."). And like the officers in *Hastings*, the officers here followed Dominic into an enclosed space and blocked the exit, resulting in Dominic picking up a handy implement to defend himself. *Hastings*, 252 F. App'x at 199. The officers in both cases drew their weapons in response to the individual grabbing a weapon and fired only after the individual made what the officers perceived as an offensive movement. But the arming and perceived offensive movements were in direct response to the officers' conduct. *Id.* at 199, 203. Thus, a jury could reasonably determine that the officers here, like those in *Estate of Ceballos*, *Allen*, and *Hastings*, unreasonably escalated a non-lethal situation into a lethal one through their own deliberate or reckless conduct.

### c. *Synthesis*

Our analysis of the *Graham* factors at the moment the officers used deadly force was inconclusive, but instructive. We determined a reasonable jury could conclude Dominic's movement was purely defensive, but we reached no conclusion as to whether a misperception would be reasonable. This is because any analysis of whether a reasonable jury could find that the use of force here was not justified, must include the fact that an intoxicated and unarmed Dominic was backed into the garage by three armed officers, at which point Dominic armed himself with the hammer.

The application of *Allen*, *Hastings*, and *Estate of Ceballos* shows that the officers' role in causing this essential set of facts is not only relevant, but

27

determinative here. When the officers first made contact with Dominic, the *Graham* analysis would likely not have justified any force, let alone deadly force. A jury could find that the officers recklessly created a lethal situation by driving Dominic into the garage and cornering him with his tools in reach. When Dominic grabbed the hammer, the officers drew firearms and began shouting. A reasonable jury could find that the officers' reckless conduct unreasonably created the situation that ended Dominic's life.

***

Viewing the facts in the light most favorable to the Estate, including the actions of the police officers that may have recklessly escalated the situation, a reasonable jury could find that Officers Girdner and Vick violated Dominic's Fourth Amendment right to be free from unreasonable seizure.

## 2. Clearly Established Law

We have concluded that summary judgment was improper on the first prong of qualified immunity—violation of a constitutional right. But we must uphold the grant of summary judgment unless the Estate can also establish the second prong necessary to overcome the presumption of qualified immunity—that the constitutional right violated was clearly established. *Pearson*, 555 U.S. at 237, 243.

In making that determination, we may "not . . . define clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)). And this directive "is particularly important in excessive force cases." *Id.*

28

"Nevertheless, our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis*, 967 F.3d at 992 (quotation marks omitted); *see Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("The plaintiff is not required to show . . . that the very act in question previously was held unlawful . . . ." (quotation marks omitted)). Rather, "'the salient question is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). This requirement is satisfied where there exists "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation marks omitted).

Having held that a reasonable jury could find the officers violated the Fourth Amendment under the *Allen* line of cases, our analysis of clearly established law narrows to *Allen* and *Sevier*.[17] As an unpublished decision, *Hastings* "provides little

___

[17] The Estate also relies on *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015), *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), and *Zuchel v. City & County of Denver*, 997 F.2d 730 (10th Cir. 1993). Those cases, it proffers, clearly establish that because Dominic was "holding 'only' a hammer, 'not a gun'" and "did not charge or lunge at the [o]fficers and . . . made no other aggressive move towards the [o]fficers," the officers violated clearly established law even setting aside their conduct in creating the need for deadly force. Appellant Br. at 22 (quoting *Walker*, 451 F.3d at 1160).

support for the notion that the law is clearly established." *Grissom v. Roberts*, 902

F.3d 1162, 1168 (10th Cir. 2018) (quotation marks omitted). *Estate of Ceballos* was

decided after the underlying events here and, as we explained there, resolution of the

clearly established law prong is necessarily governed by cases published before the

alleged violation. 919 F.3d at 1219. But *Ceballos* does advance our analysis because

it concludes that *Allen,* an opinion issued before the officers' actions here, clearly

established

> that an officer violates the Fourth Amendment when his or her reckless or
> deliberate conduct results in the need for lethal force or when the officers
> rely on lethal force unreasonably as a first resort in confronting an irrational
> suspect who is armed only with a weapon of short-range lethality and who
> has been confined on his own property.[18]

*Estate of Ceballos*, 919 F.3d at 1219.

This clearly established law is directly applicable to the facts in this case:

Here, the officers knowingly confronted a potentially irrational subject (Dominic was

---

Having utilized the traditional *Graham* analysis to pinpoint what factors may have made the use of force justified at the moment of the shooting, we declined to limit our analysis to that moment. Accordingly, we need not determine whether, as the Estate asserts, *Tenorio*, *Walker*, and *Zuchel* clearly establish that, at the moment of the shooting, deadly force was unjustified. Instead, we focus on the *Allen* line of cases and the question of whether it was clearly established that in the totality of the circumstances, the officers' conduct (including reckless conduct creating the need for the use of deadly force) violated Dominic's rights.

[18] The inclusion of the phrase "on his own property" in *Estate of Ceballos* might seem to distinguish this case in a material manner, but that qualifier is a description of the facts in *Estate of Ceballos*, not *Allen*. In *Allen*, the decedent was approached and killed in front of his sister's residence, not his own. 119 F.3d at 839.

inebriated) who was armed only with a weapon of short-range lethality (a hammer) and who had been confined (in a garage). *Allen* established that applying lethal force after deliberately or recklessly manufacturing the need to do so in such a scenario is a constitutional violation. *Id.;see also Hastings*, 252 F. App'x at 206 (holding officers' conduct violated law clearly established by *Allen* and *Sevier* "that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him).").

Moreover, the distinction in facts between this case and *Allen* tends to show why this matter is further from the line of reasonableness, not closer. In *Allen*, the officers had not threatened the decedent, but here Officer Girdner was moving toward Dominic, in an apparent effort to search him without a reasonable suspicion Dominic was armed. In *Allen*, the decedent was already armed when the officers arrived, whereas Dominic did not arm himself until after the officers had cornered him. And in *Allen*, the decedent had a gun; Dominic had only a hammer. *See Estate of Ceballos*, 919 F.3d at 1216 ("Allen was armed with a weapon—a gun—capable of harming someone from a much greater distance and with greater lethal potential than Ceballos's baseball bat (or at worst, his pocket knife)" so there was "stronger justification for the police shooting at issue there").

Our conclusion that *Allen* clearly established the officers' conduct was unconstitutional when viewed in the light most favorable to the Estate, is bolstered by our similar holdings in *Hastings* and *Estate of Ceballos*. A reasonable officer, faced

31

with the circumstances here and presumptively aware of our decision in *Allen*, would have known that cornering Dominic in the garage might recklessly or deliberately escalate the situation, such that an officer's ultimate use of deadly force would be unconstitutional.

### III.    CONCLUSION

For these reasons, we **REVERSE** the district court's grant of summary judgment to Officers Girdner and Vick and **REMAND** for further proceedings consistent with this opinion.