**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CLINT HASTINGS, as Personal
Representative of the Estate of Todd
Thomas Hastings, deceased,

       Plaintiff - Appellee,

  v.

MICHAEL BARNES; SHANE
DAVIS,

       Defendants - Appellants.

No. 04-5144
N.D. Okla.
(D.C. No. 03-CV-538-EA)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **EBEL**, and **O'BRIEN**, Circuit Judges.

     City of Owasso Police Officers Michael Barnes and Shane Davis shot and

killed a suicidal Todd Hastings (Todd) when he approached them with a Samurai

sword. Clint Hastings (Hastings), Todd's brother and personal representative,

filed a civil rights action against Barnes and Davis, who moved for summary

judgment based on qualified immunity. The district court denied the motion.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Barnes and Davis appeal from that denial. We affirm.[1]

## I. FACTUAL BACKGROUND

On the morning of August 23, 2002, thirty-two-year-old Todd Hastings called Family and Children Services in Tulsa, Oklahoma, expressing thoughts of suicide and seeking counseling. Todd told the intake worker who answered his call he was planning to commit suicide by running a hose from his truck into his home, thereby asphyxiating himself. With Todd's permission, the intake worker contacted Community Outreach Psychiatric Emergency Services (COPES), which in turn called 911. The 911 operator contacted the Owasso Police Department (Owasso) to conduct a well-being check on Todd. Because Todd's home was not within its jurisdiction, Owasso called the Tulsa County Sheriff's Office. The

---

[1] Hastings also sued the City of Owasso claiming it was liable for failing to properly train and supervise its officers. In the same order denying summary judgment to Barnes and Davis, the district court denied the City's motion for summary judgment. In their opening brief, Barnes and Davis allege the City is not liable because they did not violate Todd's rights. In response, Hastings argues Barnes and Davis' appeal of the denial of summary judgment to the City should be dismissed for lack of jurisdiction because the City never gave notice of its intent to appeal (the Notice of Appeal expressly stated only Barnes and Davis were appealing) and the court's denial of summary judgment to the City is not a final appealable order. In their reply brief, Barnes and Davis do not respond to Hastings's arguments and the City is never mentioned.

A traditional denial of summary judgment (as compared to a denial of summary judgment based on qualified immunity) is not a final appealable order. *Swint v. Chambers County Comm'n,* 514 U.S. 35, 42-43 (1995); *Moore v. City of Wynnewood*, 57 F.3d 924, 928-29 (10th Cir. 1995). Therefore, to the extent Barnes and Davis and/or the City are attempting to appeal the denial of summary judgment to the City, we lack jurisdiction and decline to exercise pendent appellate jurisdiction over it. *See Moore,* 57 F.3d at 929. Thus, we limit our discussion to Barnes and Davis' appeal of the denial of qualified immunity.

-2-

Sheriff's Office dispatched Deputy Christopher Yerton but requested back-up from Owasso because there were no other deputies in the area. Owasso sent Officers Barnes and Davis and Reserve Officer David Bigley. Yerton, Barnes, Davis and Bigley all knew Todd was contemplating suicide by asphyxiation, was non-violent and was not known to be armed.[2]

Upon arriving at Todd's address, Yerton, Barnes, Davis and Bigley observed a truck in the driveway but no hose running from it.[3] They also discovered there were two houses on the property. Yerton knocked on the door of the first house. An elderly female, later identified as Todd's grandmother, answered the door. Yerton asked her if Todd lived there; she responded he lived in the other house. When Yerton asked her whether Todd was alone, she stated she did not know. Yerton told her, "'Well, we're going to go down to talk to him

_____

[2] During Yerton's deposition, he indicated the Owasso officers informed him after the incident that Todd had previously been involved in a situation where he was "either walking or chasing his girlfriend or something in Owasso or he was seen walking--something to do with he's in Owasso with [a Samurai] sword out in the open." (R. App. at 43.) There is no other evidence in the record indicating the Owasso officers knew Todd or were aware he had any propensity for violence prior to August 23, 2002. In fact, Davis testified he had never met Todd and did not know anything about him prior to August 23, 2002.

[3] Although a COPES employee was on his way to the scene, it is unclear whether all of the officers knew this at the time of the incident. Yerton testified he did not recall whether he was aware a COPES employee was en route. Barnes initially testified similar to Yerton. Later in his deposition, however, he stated he knew a COPES employee was on his way. During Yerton's deposition, Hastings's counsel suggested the Owasso officers knew a COPES employee was on his way to the scene but the record does not contain Davis or Bigley's testimony on the matter.

for a little bit.  He's not in trouble.'"  (R. App. at 113.)  The officers then proceeded to the other house.  At that time, Barnes had his weapon and pepper-spray drawn.

Yerton knocked on the front door.  When no one answered, Yerton knocked a second time.  Todd opened the door halfway.  He was wearing only pants.  Yerton asked him whether he was Todd Hastings and whether he had told the counseling service he was going to hurt himself.  Todd answered "'yes'" to both questions.  (*Id*. at 116.)  Yerton then asked Todd to step out onto the front porch and talk with him.  The officers described Todd's behavior at this point as "real nervous," "[a]gitated" and "a little evasive."  (*Id*. at 116-17, 153, 199.)  Todd stated he wanted to get his shoes.  Yerton told him he did not need his shoes and to step out on the porch and talk with him.  Again, Todd said he wanted to get his shoes.  Believing Todd was going to shut the door and retreat into the house, Yerton placed his foot in the doorway.  As Yerton expected, Todd slammed the door and ran into a bedroom near the front door.  Yerton's foot stopped the door from closing.

Yerton entered the home and opened the bedroom door.  He saw Todd pick up a Samurai sword with a 20-inch blade and a 21-inch handle.  Yerton drew his weapon and yelled "'[k]nife'" to the other officers.  (*Id*. at 119.)  Yerton positioned himself on the left side of the bedroom's doorway, with his body

behind the door frame.[4] Upon hearing Todd had a knife, Davis and Bigley drew their weapons. Barnes, Davis and Bigley positioned themselves in the bedroom's doorway, which was less than three feet wide. Todd was eight to twelve feet away from the officers. Davis testified that an individual holding a similar knife, and standing within twenty-one feet of an officer, could stab the officer before the officer could draw and fire his weapon.

Yerton, Barnes and Davis all testified Todd held the sword like he was going to swing a baseball bat. Yerton further testified Todd was holding the sword in a defensive manner, not aggressively. The officers ordered Todd to put the sword down. He did not comply. Todd briefly turned the sword upon himself, like he was going to stab himself. He then returned to his original stance. The officers continued to order Todd to drop the sword.

Thereafter, Todd lowered the sword, grabbed the telephone and talked into the receiver. Yerton, Barnes and Bigley observed him talking into the telephone but did not hear what was said. Davis testified he heard Todd say something to the effect of "'help me'" or "'they are coming to get me.'" (*Id.* at 210.) While Todd was talking on the telephone or after he put the receiver down, Barnes attempted to get him to drop the sword (thereby allowing the officers to secure Todd) by pepper-spraying him directly in the face for one to two seconds.

_____

[4] At his deposition, Yerton testified he drew his weapon when he first observed Todd with the sword. However, in his interview after the incident, he stated he drew his weapon as he entered the house.

Although pepper-spray generally causes immediate blindness in the subject sprayed, it did not have such effect on Todd. Rather, Todd turned the sword toward the officers and began moving toward them.[5] Barnes, Davis and Bigley attempted to retreat but it was too crowded in the bedroom's doorway. Barnes shot him once; Davis shot him three times.[6] Todd died at the scene. The entire incident lasted less than four minutes.[7]

On August 12, 2003, Hastings filed a complaint under 42 U.S.C. § 1983 against Barnes and Davis alleging they violated, *inter alia*, Todd's Fourth Amendment right to be free from unreasonable searches and seizures. Barnes and Davis filed a motion for summary judgment claiming they were entitled to

[5] According to Barnes, in response to being hit with the pepper-spray, Todd snapped his head up, became wide-eyed, and glared at Barnes with rage. Davis testified Todd seemed to become enraged after being hit with the pepper-spray. Yerton did not know Todd had been pepper-sprayed until after Todd was shot and he smelt the pepper-spray in the bedroom. However, he testified he did not notice a change in Todd's demeanor throughout the encounter.

[6] According to Barnes, he attempted to retreat but backed into the hallway wall. He testified Todd had walked 3-4 steps toward him and was within five feet when he shot him. He fired his weapon as he was falling over Bigley, who had tripped over debris left in the hallway. At the same time Barnes fired at Todd, Davis shot Todd twice. Because Todd continued to move toward the officers, Davis shot him a third time. After Davis's third shot, Todd fell to the floor. Yerton testified that when Todd began approaching the officers with the sword, one of the Owasso officers bumped into him while attempting to retreat. Yerton fell back and therefore did not have a clear shot at Todd.

[7] After the shooting, the officers learned Todd's telephone was still connected to the intake worker at Family and Children Services. He had been talking to her when the officers arrived. The intake worker heard the officers tell Todd to drop the sword; she also heard the gunshots.

qualified immunity because their decision to shoot Todd was in self-defense and therefore objectively reasonable under the Fourth Amendment. The district court denied the motion, concluding Barnes and Davis were not entitled to qualified immunity.

## II. DISCUSSION

"We review a grant of summary judgment de novo, applying the same legal standard used by the district court under Fed. R. Civ. P. 56(c)." *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1182 (10th Cir. 1995). "Summary judgment should be granted if 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). "We consider the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Id.* at 1182-83 (quotations omitted).

In a § 1983 action, "individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Jiron v. City of Lakewood*,

392 F.3d 410, 414 (10th Cir. 2004) (citation and quotations omitted). Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct. *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). Our inquiry must be conducted in this order; in other words, we must first address whether the alleged facts demonstrate the defendant's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court concludes no constitutional right has been violated, no further inquiry is necessary and the defendant is entitled to qualified immunity. *Id.*

A. Constitutional Violation

Barnes and Davis argue their use of deadly force in this case was reasonable under the Fourth Amendment. They assert their actions were reasonable given their only intent/motive was to prevent Todd from harming himself or others. Barnes and Davis also claim it is undisputed Todd was moving toward them with a large sword and refusing to stop when they shot him. Thus, they contend the shooting was necessary to avoid harm to themselves. Barnes and Davis further allege their actions preceding the shooting, in particular, Barnes's use of pepper-spray, are irrelevant. To the extent they are relevant, they maintain their use of pepper-spray was a reasonable, non-lethal course of action in light of the circumstances they encountered.

Hastings argues the district court properly applied the *Graham* excessive force factors to conclude Barnes and Davis' actions in this case constituted a Fourth Amendment violation. *See Graham v. Connor*, 490 U.S. 386 (1989). He asserts Barnes and Davis were not responding to a crime or attempting to effectuate an arrest. Rather, they were responding to an individual who was contemplating suicide and seeking help. Therefore, Hastings alleges Barnes and Davis knew they were dealing with an individual who was potentially mentally ill or emotionally disturbed. Under such circumstances, Hastings contends Barnes and Davis' training required them to de-escalate the situation. Rather than de-escalate the situation, however, they escalated it by entering the home, confronting Todd in his bedroom doorway, and pepper-spraying him, to the point deadly force was required. To the extent Todd was not complying with the officers' demands to drop the sword, Hastings argues there was evidence Todd perceived the officers as aggressors and was attempting to defend himself. Indeed, according to Yerton, Todd's stance was defensive, not aggressive, until he was pepper-sprayed.

The district court concluded genuine issues of material fact existed as to whether Barnes and Davis' actions were objectively reasonable, in particular, (1) whether Todd's failure to drop the sword constituted resistance to the officers or could be attributed to his irrational fear and an attempt to defend himself against what he perceived to be aggressors, (2) the degree of threat posed by Todd prior

to him being pepper-sprayed, *i.e.*, whether his stance was aggressive or merely defensive, (3) whether Barnes and Davis were acting in accordance with their training, and (4) whether Barnes and Davis precipitated the need to use deadly force against Todd. The court also determined that the facts, as alleged by Hastings, *i.e.*, that Barnes and Davis were aware of Todd's suicidal mental condition, that they escalated the situation through their use of pepper-spray and that Todd posed little threat to them, provided sufficient evidence for a jury to determine Barnes and Davis' use of deadly force was unreasonable. We agree.

Claims of excessive force – deadly or not – are analyzed under the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 395. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotations omitted). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation and quotations omitted).

"The reasonableness of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quotations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Id. (citation and quotations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (quotations omitted).

Deadly force is reasonable under the Fourth Amendment if a reasonable officer in the defendant's position would have had probable cause to believe there was a threat of serious physical harm to himself or others. *Jiron*, 392 F.3d at 415*; see also Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Therefore, an officer's use of deadly force in self-defense is not unreasonable under the Fourth Amendment. *Romero v. Bd. of County Comm'rs of the County of Lake, Colo.*, 60 F.3d 702, 704 (10th Cir. 1995).

At the moment of the shooting, Todd was advancing toward Barnes and Davis with the sword. Thus, when Barnes and Davis shot Todd, they were acting

-11-

in self-defense and, viewed in isolation, the shooting was objectively reasonable under the Fourth Amendment. Hastings does not dispute this conclusion. Rather, he argues Barnes and Davis' actions preceding the shooting precipitated their need to use deadly force, thereby rendering their use of such force unreasonable.

The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force. *Jiron*, 392 F.3d at 415; *see Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001); *Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). However, only reckless and deliberate conduct that is immediately connected to the seizure will be considered. *Medina*, 252 F.3d at 1132. In other words, mere negligent conduct or conduct attenuated by time or intervening events is not to be considered. *Sevier,* 60 F.3d at 699 n.8.

Our review of the record convinces us that whether Barnes and Davis' actions unreasonably precipitated their need to use deadly force calls for a jury determination. But, viewing the facts in the light most favorable to Hastings, a constitutional violation occurred. Todd was not a criminal suspect. He was a potentially mentally ill/emotionally disturbed individual who was contemplating suicide and had called for help. Rather than attempt to help Todd, Barnes and Davis crowded themselves in Todd's doorway (leaving no room for retreat),

issued loud and forceful commands at him and pepper-sprayed him, causing him to become even more distressed.[8]  At the time they pepper-sprayed him, Todd was not verbally or physically threatening them.  At least one of the officers heard Todd say "'help me'" or "'they are coming to get me.'"  (R. App. at 210.)  Although Todd had a sword, his stance, at least up until the time he was pepper-sprayed, was defensive not aggressive, posing no threat to anyone but himself.  A reasonable jury could find that under these facts Barnes and Davis' actions unreasonably escalated the situation to the point deadly force was required.

B.  Clearly Established Law

Even assuming their actions were not objectively reasonable, Barnes and Davis maintain the district court erred in determining they were provided fair warning their actions violated the Fourth Amendment.  They claim the court's reliance on *Graham* was improper because it is cast at too high a level of generality.  They also allege the Tenth Circuit cases relied upon by the court (and Hastings) are not sufficiently particularized to provide the requisite fair warning their conduct violated Todd's rights.  Rather, Barnes and Davis claim their conduct fell within the "'hazy border between excessive and acceptable force'" to

---

[8] Hastings's use of force expert admitted Barnes and Davis did not violate the standards governing police officer interactions with mentally ill/emotionally disturbed individuals when they followed Yerton into Todd's home.  Moreover, Hastings does not appear to challenge Barnes and Davis having their weapons drawn during their encounter with Todd.  Therefore, our discussion will focus on Barnes and Davis' actions in positioning themselves in Todd's bedroom doorway, issuing loud and forceful verbal commands and pepper-spraying Todd.

which providing the protections of qualified immunity is appropriate. (Appellants' Opening Br. at 20 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).) They also rely on *Jiron* as establishing the objective reasonableness of their actions.

Hastings claims the objective unreasonableness of Barnes and Davis' conduct was clearly established at the time of the incident. He asserts it was clearly established in August 2002 that officers violate the Fourth Amendment when they (1) disregard actual knowledge of an individual's discernable mental condition and (2) act in a manner which unreasonably creates the need to use deadly force. This is especially true, he argues, when the individual has not committed a crime, was not attempting to escape and was acting in a non-threatening defensive manner. He relies on *Allen, Sevier* and *Cruz v. City of Laramie*, *Wyo.*, 239 F.3d 1183 (10th Cir. 2001).

Whether a right is clearly established for purposes of qualified immunity must be decided "in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 543 U.S. at 198 (quotations omitted). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quotations omitted). The relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. "Ordinarily, in order for the law to be clearly established, there must be a

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiffs maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). However, it is not necessary for the precise conduct of the defendants to have been previously held unlawful—it is enough if preexisting law gave the defendants fair warning their conduct violated the law. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (stating "officials can still be on notice that their conduct violates established law even in novel factual circumstances;" while "earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding") (quotations omitted); *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("[T]he qualified immunity analysis [has shifted] from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."). Although alleged rights violations must be analyzed at the proper level of generality, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce*, 359 F.3d at 1298.

In concluding the law was clearly established, the district court relied on *Graham*, *Allen* and *Sevier*. Because this case is not an "obvious" one, *Graham*

alone does not clearly establish the unlawfulness of Barnes and Davis' conduct.

*Brosseau*, 543 U.S. at 199. Nevertheless, we conclude the unreasonableness of

Barnes and Davis' actions was clearly established by *Allen* and *Sevier*.[9]

In *Allen*, Terry Allen went to his sister's home after an altercation with his

family, taking ammunition and several guns with him. Officer Smith proceeded

to the sister's home with a description of Allen and his car and knowing Allen

was armed and threatening to commit suicide. When Smith arrived at the sister's

home, Allen was sitting in the driver's seat of his vehicle with one foot out of the

vehicle. He had a gun in his right hand, which was resting on the console

between the seats. As Smith was repeatedly ordering Allen to drop the gun,

Officer McDonald arrived and joined Smith at the driver's side door. Smith then

reached into the vehicle and attempted to seize the gun while McDonald held

Allen's left arm. In the meantime, Officer Farmer approached the vehicle on the

passenger side and attempted to open one of the side doors. Allen reacted by

pointing the gun at Farmer, who ducked and moved behind the car. Allen then

swung the gun toward Smith and McDonald and shots were exchanged. Smith

and McDonald fired a total of twelve rounds into the vehicle, striking Allen four

_____

[9] In addition to *Allen* and *Sevier*, Hastings relies on *Cruz*. *Cruz* held it is unlawful for police officers to hog-tie an individual with an apparent diminished capacity, including a discernable mental condition. 239 F.3d at 1188. Barnes and Davis did not physically restrain Todd in any way. Therefore, while *Cruz* may clearly establish that an individual's discernable mental condition is relevant in analyzing the reasonableness of an officer's use of force, it provides no guidance on the reasonableness of Barnes and Davis' conduct in this case.

times and killing him. The total encounter lasted ninety seconds. Allen's representative brought suit against the officers under § 1983 alleging excessive force in violation of the Fourth Amendment. The officers moved for summary judgment, which was granted. We reversed, concluding there was a genuine issue of material fact as to whether the officers' actions were reckless and precipitated the need to use deadly force. 119 F.3d at 840-41. Specifically, we noted some eyewitnesses testified Smith ran "screaming" up to Allen's car and immediately began shouting at him to get out of the car while others stated he approached cautiously and tried talking Allen into giving up his gun. *Id.* at 841 (quotations omitted).

In *Sevier*, Officers Bordman, Phillips and Wheeler responded to a 911 call from the parents of Gregory Sevier, who was in his bedroom with a butcher knife. The officers were informed the parents were not sure what was wrong with Gregory but believed he was having trouble with his girlfriend and wanted an officer to talk to him. Bordman arrived on the scene first. It was disputed whether he stopped to talk with Gregory's parents or ignored their attempts to discuss the situation. Bordman unlocked Gregory's bedroom door. Because of the loud music Gregory was playing, Bordman was unable to communicate with Gregory. However, Gregory did state, "'I didn't do anything.'" 60 F.3d at 698. Shortly thereafter, Phillips arrived. Bordman warned Phillips he believed Gregory had a knife; both officers drew their weapons. Bordman opened

-17-

Gregory's bedroom door, while Phillips retreated down the hallway. Bordman asked Gregory to show his hands. Gregory then emerged from the bedroom and stood in the doorway with a knife. Bordman moved backwards into a bedroom directly across from where Gregory was standing. Bordman and Phillips repeatedly ordered Gregory to drop the knife and Bordman told Gregory they were not going to hurt him. Wheeler then arrived at the scene and took a position behind Phillips. Gregory's parents stood behind Wheeler and Phillips. Gregory cried "'I love you, Mom. I love you, Mom.'" *Id.* His mother responded, "'I love you, Gregg.'" *Id.* According to all three officers, Gregory then turned to his left and lunged at Bordman with the knife in a raised and striking position. Bordman and Phillips fired at Gregory, hitting him six times and killing him. Gregory's parents disputed that Gregory lunged at Bordman and contended he was standing with the knife at his side.

The district court denied Bordman and Phillips' motion for summary judgment based on qualified immunity. We concluded we lacked jurisdiction over their appeal because it sought review of the court's ruling that summary judgment was inappropriate because genuine issues of material fact remained in dispute. *Id.* at 700. We noted the court's ruling was likely based on the fact some evidence showed Gregory did not lunge at the officers with a knife. *Id.* at 700-01. We also stated the ruling could have been based on the finding there was conflicting evidence as to whether the officers' own actions immediately prior to

-18-

the shooting precipitated their use of deadly force. *Id.* at 701. We observed the record revealed some evidence upon which a jury could conclude that Bordman and Phillips acted recklessly by confronting Gregory in the manner they did knowing he was armed and distraught over problems he was having with his girlfriend and without gathering more information on the situation. *Id.* at 701 n.10.

*Allen* and *Sevier* provided Barnes and Davis the requisite fair warning that their conduct in this case was unlawful. They clearly establish that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him). That is exactly what Barnes and Davis did in this case. Rather than attempt to talk to Todd and calm him, they cornered him in his bedroom, issued loud and forceful commands at him and pepper-sprayed him, thereby further upsetting Todd and precipitating the need to use deadly force.

*Jiron* (decided after the incident in this case) is not to the contrary. There, Officer Haplin responded to a report that "two drunk girls" had stolen a purse at an apartment complex. 392 F.3d at 412. At the scene, Haplin confronted fifteen-year-old Jiron, one of the suspects. Before Haplin could handcuff her, Jiron fled into her sister's second-story apartment, grabbed a kitchen knife and ran into the back bedroom. Haplin called for backup and headed toward the bedroom. Her

plan was to keep Jiron in the bedroom until backup arrived. That plan changed when Jiron attempted to escape through the bedroom window. When Haplin ordered her to stop, Jiron came at Haplin with the knife. Haplin retreated down the hallway; Jiron closed the bedroom door. When Haplin opened the bedroom door, she saw Jiron hiding behind it. Haplin repeatedly ordered Jiron to drop the knife and leave the bedroom. Jiron finally left the room, placed the knife up to her chin and threatened to kill herself. When Jiron began advancing toward Haplin, Haplin ordered Jiron to drop the weapon. When Jiron did not drop the weapon, Haplin drew her firearm and warned Jiron to drop the weapon or she would have to kill her. Jiron responded, "'Okay. Kill me.'" *Id.* When Jiron was within five feet of Haplin, she turned the knife toward Haplin, raised it up and began hacking it in the air. Haplin shot Jiron once in the abdomen. Jiron filed a § 1983 lawsuit against Haplin claiming excessive force in violation of the Fourth Amendment. Relevant here, we rejected Jiron's claim that Haplin unreasonably precipitated the need to use deadly force by cornering Jiron in the bedroom, repeatedly ordering her out of the bedroom and attempting to open the bedroom door even though she had no means to escape. *Id.* at 418. We concluded Haplin "adequately performed her duties as a reasonable law enforcement officer by taking steps to prevent an armed and agitated suspect from escaping [into the public]." *Id.*

*Jiron* holds an officer may intervene to prevent the escape of an armed

criminal suspect into the public—it says nothing about the reasonableness of an officer's actions in responding to an emotionally disturbed individual's call for help. *See id.* at 419 (rejecting Jiron's reliance on *Sevier* because it is factually distinguishable, specifically, the victim in *Sevier*, unlike Jiron, was not a criminal suspect and posed no threat to others while he remained in his room). Thus, *Jiron* does not clearly establish the objective reasonableness of Barnes and Davis' conduct in this case.[10]

---

[10] The district court also relied on Barnes and Davis' training as clearly establishing the unlawfulness of their actions. Barnes and Davis were trained that when dealing with mentally ill or emotionally disturbed individuals, they should attempt to de-escalate the situation, be calm, attempt to establish a line of communication, listen to them, prevent them from harming themselves or others and look for signs of mental instability such as mood changes, behavior changes and irrational thinking. They were also trained not to irritate them, move suddenly or give rapid orders, shout at them, force discussion with them, enter their comfort or critical zones, crowd them, touch them unless necessary, make continuous eye contact with them or call them such things as "'psycho'" or "'crazy.'" (R. App. at 144.) It is unclear whether this training applies to *armed* mentally ill/emotionally disturbed individuals (like Todd) or merely those individuals in general. Moreover, it is unclear whether an officer's training can establish the unconstitutionality of his actions. *Compare Hope,* 536 U.S. at 744-45 (relying on prison regulation as further support that prison officials had fair warning that the continued use of a hitching post on an inmate after he terminates his resistance is unconstitutional) *with Tanberg v. Sholtis*, 401 F.3d 1151, 1160 (10th Cir. 2005) (stating a police department's standard operating procedure "is not enough to create a clearly established right to be arrested without a warrant only by an on-duty police officer; if a right is to be recognized as a clearly established constitutional right, there must be a Supreme Court or Tenth Circuit decision on point"). In light of the fact that there is Tenth Circuit case law clearly establishing the unlawfulness of Barnes and Davis' actions in this case, we need not resolve these issues.

AFFIRMED.

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge