FILED
United States Court of Appeals
Tenth Circuit

May 14, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

LATARSHA FLORES; SAMUEL JACKSON, individually and as representatives of the Estate of Shamikle Jackson, and as next friends of N.J., successor in interest,

    Plaintiffs - Appellees,

v.

JUSTIN HENDERSON, individually; KEITH MATTHEWS, individually; TONEY HANNON, individually; CLARK ORCHARD, individually,

    Defendants - Appellants.

No. 23-1049

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:20-CV-00618-RBJ)**

_____

Heidi J. Hugdahl, Bruno, Colin & Lowe, P.C., Denver, Colorado (David M. Goddard, Bruno, Colin & Lowe, P.C., Denver, Colorado; and Julia Bannon, Office of the City Attorney, Aurora, Colorado, with her on the briefs) for Defendants-Appellants.

Kylie M. Schmidt, Ogborn Mihm LLP, Denver, Colorado (Jason B. Wesoky, Ogborn Mihm LLP, Denver, Colorado; Kenneth R. Fiedler and James Anderson, Fiedler Injury Law, Denver, Colorado; and Penelope L. Clor, Tomazin Law Group, Denver, Colorado, with her on the brief) for Plaintiff-Appellees.

_____

Before **TYMKOVICH**, **MATHESON**, and **BACHARACH**, Circuit Judges.

_____

**TYMKOVICH**, Circuit Judge.

_____

Shamikle Jackson called 911 to report that two people were dead inside an apartment and that he was holding others hostage. He said it was a life-threatening emergency and that his remaining hostages only had a few minutes left. Aurora Police Officers responded to the call and arrived at the scene. They first encountered Mr. Jackson's sister at the apartment door in no apparent distress. She said her brother was home but did not know whether anyone inside the apartment was hurt.

As the officers began to search Mr. Jackson's apartment, they received a radio call that the sister believed Mr. Jackson was alone, unarmed, and might have mental health problems. The officers continued down a hallway to the back bedroom. Mr. Jackson emerged from the bedroom and advanced toward the officers with a machete. He was shot and killed.

Mr. Jackson's parents sued the officers under 42 U.S.C. § 1983 for using unconstitutionally excessive force. The district court denied the officers' motion for summary judgment based on qualified immunity. It concluded a reasonable jury could find the officers recklessly created the need to use deadly force, thereby unreasonably violating Mr. Jackson's constitutional rights under clearly established law.

We reverse. The officers had a split second to respond to a deadly threat posed by Mr. Jackson. In these circumstances, it was not clearly established the officers recklessly created a situation where the use of deadly force was necessary. The officers are thus entitled to qualified immunity.

2

## I.   Jurisdiction

Plaintiffs first contend we lack jurisdiction over this interlocutory appeal because the district court's denial of summary judgment was based on a disputed issue of material fact.

"[W]e have interlocutory jurisdiction over denials of qualified immunity at the summary judgment stage to the extent that they 'turn[ ] on an issue of law.'" *Fogarty v. Gallegos*, 523 F.3d 1147, 1153–54 (10th Cir. 2008) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  "[I]ssues of law are limited to '(1) whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation' and '(2) whether that law was clearly established at the time of the alleged violation.'" *Surat v. Klamser*, 52 F.4th 1261, 1269 (10th Cir. 2022) (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1162 (10th Cir. 2021)). Because of this limitation, we "lack jurisdiction to review factual disputes in this interlocutory posture," *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1177 (10th Cir. 2020), and "we are not at liberty to review a district court's factual conclusions," *Fogarty*, 523 F.3d at 1153–54.  "[I]f a district court concludes a reasonable jury could find certain specified facts in favor of the plaintiff, we must usually take them as true—and do so even if our own de novo review of the record might suggest otherwise as a matter of law." *Surat*, 52 F.4th at 1269 (citations omitted).

But there are exceptions.  "[W]hen the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' we may assess the case based on our own *de novo* view of which facts a reasonable jury could

accept as true." *Lewis v. Tripp*, 604 F.3d 1221, 1225–26 (10th Cir. 2010) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)); *Packard v. Budaj*, 86 F.4th 859, 864–65 (10th Cir. 2023) (same). We "generally limit[] application of the exception to cases involving objective documentary evidence, such as video recordings or photographs." *Vette*, 989 F.3d at 1164. *See also Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) ("While a court considering a summary judgment motion based upon qualified immunity usually must adopt[ ] . . . the plaintiff's version of the facts, that is not true to the extent that there is clear contrary video evidence of the incident at issue.") (internal quotation marks omitted).

Because some of the key facts underlying the district court's denial of qualified immunity are inconsistent with the video evidence, we need not accept them for purposes of our analysis, *Heard v. Dulayev*, 29 F.4th 1195, 1202 (10th Cir. 2022), and "we may assess the case based on our own *de novo* view of which facts a reasonable jury could accept as true," *Lewis*, 604 F.3d at 1226 (citations omitted). We therefore accept the district court's factual findings to the extent such facts are not inconsistent with bodycam footage and audio.[1]

We always have jurisdiction to review questions of law. Whether we accept a district court's factual findings or not, we can still review (1) whether a reasonable

---

[1] The officers contend the district court improperly relied on allegations in plaintiff's unverified complaint. Because the record includes audio and video footage of what transpired, we need not reach this claim.

jury could find the facts suffice to show a legal violation and (2) whether the law was clearly established as to those facts. *See Packard*, 86 F.4th at 864.

## II.     Factual Background

Shortly before 9:00 a.m. on Monday, March 4, 2019, Mr. Jackson placed a 911 call. He told the dispatcher he was holding people hostage and that two of the hostages were already dead. The district court did not make the following findings, but audio from the 911 call provides that Mr. Jackson reported a "life-threatening emergency" that was "happening now," claimed to have a machete, said people would need medical attention in a few minutes, and that his hostages were tied up and "very much" in danger. Exhibit A. He then hung up in the middle of the call.

Aurora Police Officers Justin Henderson, Keith Matthews, Toney Hannon, and Clark Orchard responded to the call at a multi-apartment complex. The officers arrived and identified Mr. Jackson's apartment. He lived with his sister Shaquayla Jackson and her minor child.

His apartment door was open, but he was not in view. When the officers announced themselves, a voice from inside responded the officers would have to "come and get me." Exhibit C. Mr. Jackson's sister then came to the front door. The officers asked her who was in the apartment, and she responded that her brother was. Although not included in the district court's findings, the officers then asked if anyone inside the apartment was hurt, and she said, "I don't know." *Id.* His sister stepped outside the apartment and onto the landing.

The officers again announced their presence and entered the apartment. There were no signs of violence or disturbance. They first searched the kitchen, and as they searched the front bedroom, they received a radio call from Officer Bridget Johnson—who stayed outside with Mr. Jackson's sister. Officer Johnson transmitted to the other four officers by radio that the sister reported, "her brother is the only one in the apartment, he doesn't have access to weapons, and he might have mental health issues." Exhibit B. Mr. Jackson was seen for a mental health evaluation a week before—a fact known to his sister and family members, but not to the officers. We accept as true the district court's finding that Mr. Jackson was experiencing mental health issues.

After receiving the radio call, the officers formed a line or "stack" behind Officer Henderson. Exhibit L. The four officers continued down the hallway toward the second bedroom with Officer Henderson first (his handgun drawn), Officer Matthews second (taser drawn), and then Officers Orchard and Hannon (no weapons drawn). Aplt. App. at 261, 453. When the officers reached the second bedroom door, they announced themselves. At this point, the district court determined the officers "entered the bedroom in which Mr. Jackson was located," "corner[ed]" him, "shot [him] multiple times and killed him." Aplt. App. at 464. The district court concluded the officers were aware there were no hostages because they had entered Mr. Jackson's *bedroom* before the shooting. But the bodycam footage tells a different story. The officers remained in the *hallway*, and never entered into nor saw inside the bedroom. Officer Henderson tried to kick the bedroom door open, but

6

someone inside seemed to block it.  Exhibit C.  Within seconds, Mr. Jackson rushed

from the bedroom and moved toward the officers with a machete in hand.  *Id.*[2]

Officer Henderson then shot and killed him in the hallway outside the bedroom door.

### III.    Analysis

Plaintiffs (Mr. Jackson's parents) brought claims against (1) Officer

Henderson for excessive force in violation of the Fourth Amendment, and (2) against

Officers Matthews, Hannon, and Orchard for failure to intervene to prevent the

deprivation of Mr. Jackson's rights.  The district court denied the officers' motion for

summary judgment based on qualified immunity, concluding Officer Henderson

recklessly created the need to use deadly force in violation of clearly established law,

and determining the other three officers unreasonably failed to intervene to prevent a

violation of Mr. Jackson's constitutional rights.  The officers challenge both

conclusions.

"We review the district court's denial of a summary-judgment motion asserting

qualified immunity de novo." *Wise v. Caffey*, 72 F.4th 1199, 1205 (10th Cir. 2023)

(citing *Arnold v. City of Olathe*, 35 F.4th 778, 788 (10th Cir. 2022)).  Summary judgment

is appropriate if "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We "view the evidence

and the reasonable inferences to be drawn from the evidence in the light most

---

[2] Plaintiffs admit Mr. Jackson emerged from his bedroom holding a machete, Aple. Br. 6, and the machete is visible on the bodycam footage when the officers approach Mr. Jackson to perform CPR.

favorable to the nonmoving party." *Simpson v. Little*, 16 F.4th 1353, 1360 (10th Cir. 2021) (citations omitted).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The officers' "assertion of qualified immunity creates a presumption that they are immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). To overcome this presumption, plaintiffs must show "(1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Reavis ex rel. Estate of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020) (internal quotation marks omitted). "We have discretion to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Wise*, 72 F.4th at 1205 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "The court must grant the defendant qualified immunity if the plaintiff fails to prove either prong." *Arnold*, 35 F.4th at 788. Regardless of which prong is addressed, plaintiffs have failed to meet their burden under either one.

### A. *Constitutional Violation*

Plaintiffs allege Officer Henderson violated Mr. Jackson's Fourth Amendment rights by using excessive force against him. *See* U.S. Const. amend. IV. Specifically, plaintiffs argue Officer Henderson's use of deadly force was excessive because he recklessly created a situation in which deadly force was necessary.

"When a plaintiff claims that officers used unreasonable force during a seizure, we apply the Fourth Amendment's objective reasonableness standard." *Arnold*, 35 F.4th at 788. And "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement." *Frost*, 967 F.3d at 985 (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "Our calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Est. of George v. City of Rifle, Colorado*, 85 F.4th 1300, 1316 (10th Cir. 2023) (internal quotation marks omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). This is a "totality of the circumstances" analysis. *Arnold*, 35 F.4th at 788 (citations omitted).

The Supreme Court outlined three factors in *Graham* to determine whether a use of force is reasonable.[3] First, we consider "the severity of the crime at issue." *Simpson*, 16 F.4th at 1360–61 (quoting *Graham*, 490 U.S. at 396). Obviously, the situation self-reported by Mr. Jackson was a serious crime if true. While the officers developed some evidence from Mr. Jackson's sister, they had every reason to believe Mr. Jackson might pose a threat to himself or others.[4]

The second *Graham* factor instructs us to ask whether "the suspect pose[d] an immediate threat to the safety of the officers or others." *Id.* This second factor "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). "This is particularly true in a deadly force case, because 'deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others.'" *Frost*, 967 F.3d at 985 (quoting *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009)). "When an officer has cause to believe there is a serious threat to himself or others, the use of deadly force

---

[3] "The *Graham* factors are nonexclusive and not dispositive; the inquiry remains focused on the totality of the circumstances." *Estate of George*, 85 F.4th at 1316 (quoting *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023)).

[4] Plaintiffs argue the crime at issue would have been falsely reporting an emergency—a misdemeanor. Even if we assume that this first factor favors plaintiffs it does not change our conclusion.

is reasonable." *Arnold*, 35 F.4th at 789 (citing *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

"To determine the seriousness of a threat," we consider "multiple non-exclusive factors, including: (1) whether the officers ordered the suspect to drop his weapon and whether the suspect complied with the order, (2) hostile motions made with the weapon toward the officer, (3) the distance separating the officer and the suspect, and (4) the manifest intentions of the suspect." *Id.* (citing *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

These factors all favor Officer Henderson at the time of the shooting: (1) Mr. Jackson refused to comply with police commands to come out and show his hands, (2) he charged at the officers with a machete, (3) he was within a few feet of the officers when he exited the room, and (4) his manifest intention was to cause harm. And plaintiffs concede the situation required deadly force when Mr. Jackson emerged from his room with a machete.

Even though force was justified here at the time it was deployed, our cases instruct us that in assessing the second *Graham* factor, we must also consider whether an officer's "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.* (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).[5]

---

[5] The Supreme Court has not yet adopted the view that reasonableness requires a consideration of whether the officers recklessly created the need to use force. *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 429 n* (2017) (declining to address whether unreasonable police conduct prior to the use of force should be considered). A circuit

"Whether an officer recklessly creates the need to use force is merely one important consideration in the totality of the circumstances." *Id.* "The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Allen*, 119 F.3d at 840 (citing *Sevier*, 60 F.3d at 699). The officer's conduct "is only actionable if it rises to the level of recklessness . . . [m]ere negligen[ce] will not suffice." *Pauly*, 874 F.3d at 1220.

Although our cases do not precisely define "recklessness" in this context, it typically requires a high degree of knowledge that a risk of harm will likely result. *See* Black's Law Dictionary (11th ed. 2019) (defining "reckless" as "the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk"); Restatement (Third) of Torts: Phys. & Emot. Harm § 2 (2010) ("A person acts recklessly in engaging in conduct if . . . the person knows of the risk of harm created by the conduct or knows facts that make the risk obvious to another in the person's situation."). And for section 1983 claims based on the danger-creation theory—liability for the acts of third parties—we define recklessness as the conscious disregard of a known or obvious risk. *See T.D. v. Patton*, 868 F.3d 1209, 1230 (10th Cir. 2017). The inquiry

---

split remains. *See, e.g.*, *Arnold*, 35 F.4th at 789–90 (noting circuits that consider an officer's reckless conduct and those that do not). ‼

stays objective—we ask whether every reasonable officer would know that his or her conduct recklessly created an unreasonable risk of harm.

Plaintiffs argue Officer Henderson provoked the need to use deadly force. The district court determined plaintiffs "created a triable issue of fact as to whether the [] fail[ure] to employ de-escalation tactics to mitigate the risk of provoking a threat of deadly force against them was reckless under the second *Graham* prong." Aplt. App. at 473. The court determined Officer Henderson should not have rapidly advanced down the hallway and into the back bedroom, but instead should have retreated or tried to talk with Mr. Jackson, after receiving the radio call that Mr. Jackson might have been alone, unarmed, and suffering from a mental illness. *Id.* at 471-73.

We disagree and conclude Officer Henderson did not recklessly create the need to use deadly force. Although "our cases suggest that recklessness is manifested mostly by police onslaught at the victim," *Arnold*, 35 F.4th at 789 (internal quotation marks omitted), it is not reckless for an officer to perform a "protective sweep" of a residence if reasonable grounds exist to believe there is "a threat to a civilian's safety." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1072 (10th Cir. 2010). For instance, in *Armijo ex rel. Armijo Sanchez*, Mr. Armijo was suspected of dialing 911 and making a bomb threat to his High School. The officers entered his home, proceeded to his bedroom, entered the room, and pulled him out of bed. We found the officers did not violate Mr. Armijo's Fourth Amendment rights and were entitled to qualified immunity. We held "[t]he need to find and neutralize those behind the threats made the

13

entry reasonable. [And] [] [] the circumstances made a search for the suspect reasonable." *Id.* at 1072.

For similar reasons, we cannot conclude that Officer Henderson's decision to proceed down the hallway to Mr. Jackson's bedroom was reckless. Officer Henderson acted under exigent circumstances because he reasonably saw an "immediate need" to enter and search Mr. Jackson's apartment "to protect the lives or safety of . . . others." *See, e.g.*, *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).

Mr. Jackson's 911 call described a life-threatening emergency occurring inside the apartment. He claimed two people were dead, that he had a machete, and that his hostages only had a few minutes left. And when the officers arrived at the apartment his sister was not sure if anyone inside was hurt. Officer Henderson began his search of the apartment with information Mr. Jackson may pose a threat to someone inside or at least that someone may be hurt. When the officers received the radio call that Mr. Jackson was alone, unarmed, and mentally ill, Officer Henderson had to make a split-second judgment call—whether to credit this new and inconsistent information or not. A reasonable police officer, whether the new information was accurate or not, could have wanted to visibly confirm Mr. Jackson was secure and nobody else was in the bedroom before retreating. The circumstances would not alert every police officer it would be "reckless" to complete the search. Qualified immunity protects officers faced with the Hobson's choice of action or inaction.

One case is instructive. In *Estate of Taylor v. Salt Lake City*, we held it was reasonable for an officer to continue an investigation despite evidence no crime was

14

taking place. 16 F.4th 744, 772-73 (10th Cir. 2021). In that case, an officer responded to a report that someone "flashed" a gun. *Id.* at 747. He saw an individual matching the description enter a 7-Eleven convenience store. When the suspect exited the store, the officer confronted him. The decedent reached into his waistband as if to draw a gun, and he was shot and killed. His estate asserted the officers were reckless and unreasonable because they "should have just driven away when they observed [the decedent] exit from the 7-Eleven without incident." *Id.* at 772 (internal quotations omitted). We rejected this argument and found "[w]hile the 9-1-1 call reporting a male flashing a gun could have been describing a low-level misdemeanor, or even no crime at all, we are not aware of any precedent indicating that a reasonable officer would have been obliged to drive away and forgo an investigation, and Plaintiffs offer us none." *Id.* at 773. Similarly, here, plaintiffs point to no precedent that a reasonable officer would forgo a search armed with some knowledge of a possible murder or hostage situation even with some conflicting information.

Officer Henderson's decision to continue down the hallway was not reckless. The risk that Mr. Jackson would rush out of the bedroom with a machete was certainly not known or obvious. Officer Henderson faced many unknowns, and it was reasonable to continue the investigation to confirm whether anyone in the apartment was hurt or in danger. *See Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004) (holding it was reasonable for an officer to enter a room where a suspect was hiding because she believed she heard the suspect trying to escape through a window and was worried about the possible risk to the public if the suspect

15

escaped).  At best, Officer Henderson wrongly predicted how Mr. Jackson would react as they approached the bedroom.  And "[t]o say they should have known the plan would create a need to shoot [Mr. Jackson] is to indulge in the very sort of hindsight revision the law forbids."  *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018).

Finally, the third *Graham* factor requires us to consider "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Simpson*, 16 F.4th at 1361 (quoting *Graham*, 490 U.S. at 396)).  Mr. Jackson was certainly resisting a reasonable investigative detention—he refused to come out, told the officers they would have to come and get him, blocked his bedroom door when the officer tried to open it, and advanced toward the officers with a machete in hand.

\*\*\*

Given the totality of the circumstances, Officer Henderson's decision to proceed down the hallway was reasonable.  The situation might have been different had the officers retreated or tried to talk to Mr. Jackson through the door, but "[w]e cannot answer that question, nor is this kind of retrospective inquiry relevant."  *Jiron*, 392 F.3d at 418.  We conclude "a reasonable officer standing in the shoes of [the officer] at the time of his encounter . . . would have felt justified in taking the steps that led to the use of deadly force."  *Est. of Taylor*, 16 F.4th at 773.

### B.  Clearly Established

We separately conclude that, even if we were to assume Officer Henderson used excessive force in these circumstances, the law was not clearly established at the time of the events.

16

A law is clearly established "if a plaintiff (1) identif[ies] an on-point Supreme Court or published Tenth Circuit decision . . . or (2) shows the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Perry v. Durborow*, 892 F.3d 1116, 1122–23 (10th Cir. 2018) (quotations omitted). We do not "define the relevant constitutional right at a high level of generality. . . [and] the clearly established law must be particularized to the facts of the case." *Id.* at 1123 (citations omitted). None of our cases clearly hold that a search resulting in an armed confrontation—under these exigent circumstances— would violate an individual's constitutional rights.

Resisting this, plaintiffs and the district court rely on the following cases as clearly establishing Officer Henderson unreasonably violated Mr. Jackson's rights: *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695 (10th Cir. 1995);[6] *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007); and *Allen v. City of Muskogee, Okla.*, 119 F.3d 837 (10th Cir. 1997). We discuss each in turn.

In *Sevier*, "three police officers arrived at the home of a suicidal twenty-two-year-old in the middle of the night, opened the door to his bedroom, and confronted him with their guns drawn when he emerged. . . . The victim was not suspected of

---

[6] *Sevier* "merely noted in dicta that deliberate or reckless preseizure conduct can render a later use of force excessive before dismissing the appeal for lack of jurisdiction . . . . To state the obvious, a decision where the court did not even have jurisdiction cannot clearly establish substantive constitutional law." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 13 (2021).

having committed any crime, and the officers had no reason to suspect that he posed any threat to others while he remained in his room." *Jiron*, 392 F.3d at 419 (citing *Sevier*, 60 F.3d at 698). It was disputed whether the decedent lunged at the officers before he was shot, and we noted the "record reveals some evidence upon which a jury could conclude that Defendants acted recklessly by confronting Gregory in the manner that they did after knowing that he was armed and distraught over problems he was having with his girlfriend, and without gathering more information on the situation." *Sevier*, 60 F.3d at 701, n.10.

Here, however, the officers responded to a 911 call to investigate someone who was suspected of committing a violent crime and believed to pose a threat to someone else. In *Sevier*, the officers responded to a call concerning an individual *not* suspected of committing a crime and believed only to be a danger to himself. Thus, *Sevier* does not clearly establish law for the particularized facts in this case, and we cannot say it put a reasonable officer on notice that the conduct in this case violated Mr. Jackson's rights. The current state of Officer Henderson's knowledge—a violent crime may have been committed and that someone else may be at risk inside the apartment—materially affects the applicability of the *Sevier* precedent—a violent crime was not committed and no one else was at risk. And even if Officer Henderson knew Mr. Jackson was suffering from mental health problems, "the fact that [he] was experiencing a psychotic episode cannot itself prevent summary judgment." *Clark v. Colbert*, 895 F.3d 1258, 1264 (10th Cir. 2018).

In *Hastings*, a non-precedential decision, we held the law clearly established that "an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him)." 252 F. App'x at 206. In that case, the officers conducted a welfare check on an individual expressing thoughts of suicide. The officers arrived to find him holding a sword, and then "cornered him in his bedroom, issued loud and forceful commands at him and pepper-sprayed him, thereby further upsetting [the decedent] and precipitating the need to use deadly force." *Id.* at 206. He raised his sword toward the officers and was shot. We determined the decedent did not pose a threat to anyone until the officers unreasonably escalated the situation.

Here, again, the same key differences emerge: (1) the officers responded to Mr. Jackson's 911 call that a violent crime was occurring, rather than a call requesting a welfare check and alleging no violent crime, and (2) the officers did not know if Mr. Jackson posed a threat to anyone in his bedroom, whereas the officers in *Hastings* confronted a situation in which the individual was known to be a danger only to himself. Thus, *Hastings* does not clearly establish that Officer Henderson acted unreasonably. Again, much like *Sevier*, Officer Henderson's knowledge—a violent crime may have been committed and that someone else may be at risk—materially affects the applicability of the *Hastings* precedent.

Lastly, in *Allen*, the decedent had an altercation with his family and parked in front of his sister's house with a gun. 119 F.3d at 839. The officers were advised

that he was armed, had threatened his family, and had threatened suicide. There were bystanders on the scene and officers ordered them to step back. The officers approached his vehicle, yelled that he drop his gun, and reached inside his car to seize the gun and grab his arms. The decedent raised his gun toward the officers and was shot. We found "a reasonable jury could conclude on the basis of some of the testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841.

*Allen* did not put Officer Henderson on notice his decision to proceed down the hallway violated clearly established law. Although the officers in *Allen* were responding to a potentially dangerous crime—they were told he was armed and threatened family members—there are key differences: the officers could see the decedent, his weapon, and could evaluate exactly what type of threat he posed. Here, however, Officer Henderson had not yet encountered Mr. Jackson. Nor did Officer Henderson have stable and certain knowledge about whether Mr. Jackson was armed—much less what sort of weapon he had. In fact, Officer Henderson received conflicting information about whether Mr. Jackson was armed, alone, and whether anyone inside the apartment was hurt.

Thus, the precedent that plaintiffs cite as clearly established law does not apply to the facts of this case. In all three cases, the officers *knew* the suspect was armed, *knew* he did not pose a threat to anyone, or could *see* him and the weapon. This underscores a key difference: in cases when law enforcement officers respond to situations involving potentially emotionally disturbed individuals, the applicability of

20

precedent regarding unreasonable escalation turns on the nature of the 911 call and the officer's knowledge of the potential for violence. The officers did not know anything for certain because they had not yet encountered Mr. Jackson and were given conflicting information that materially influenced what actions would be reasonable to take under the circumstances.

The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality," *City of Tahlequah, Okla.*, 595 U.S. at 12, and that a clearly established right must be "particularized to the facts of the case," *White v. Pauly*, 580 U.S. 73, 79 (2017). S*ee also City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42-43 (2019) (emphasizing the importance of particularized facts especially in the context of excessive force).

Neither the district court nor plaintiffs have identified precedent determining a Fourth Amendment violation occurred under similar circumstances. The cases cited do not provide fair notice to Officer Henderson that his continued search of the apartment, and subsequent use of lethal force, was a violation of clearly established law. Instead, it is clearly established that officers may act under exigent circumstances when they reasonably see an "immediate need to protect the lives or safety of themselves or others." *Najar*, 451 F.3d at 718. The officers entered and searched the apartment based on a reported violent crime, and it is not clearly established the officers should have terminated this search when provided with conflicting information from a suspect's family member after the search has begun.

### C. Failure to Intervene

Finally, plaintiffs contend Officers Matthews, Hannon, and Orchard failed to intervene to prevent Officer Henderson's violation of Mr. Jackson's Fourth Amendment rights.

It was clearly established at the time of Mr. Jackson's death that "[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983." *Fogarty*, 523 F.3d at 1162; *see also Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (holding an officer can be liable for violating an individual's "clearly established rights by not taking steps to prevent other deputies' excessive force."). But "for there to be a 'failure to intervene, it logically follows that there must exist an underlying [clearly established] constitutional violation.'" *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)).

Because we hold Officer Henderson did not violate Mr. Jackson's clearly established rights, we conclude there was no failure to intervene by the other officers.

## IV.    Conclusion

The officers did not unreasonably violate Mr. Jackson's Fourth Amendment rights under clearly established law and are entitled to qualified immunity. We therefore reverse the denial of qualified immunity for the officers.